MARCOUX *v.* REARDON.

1. CORPORATIONS—WINDING UP—SALE OF CORPORATE ASSETS.
   While the statutory method of appointing a receiver for winding up the affairs of a corporation when in failing condition would be more regular and apparently the wiser course in case of an objecting stockholder, the statute does not make unlawful other methods taken by authority of the majority, where all have equal opportunities to purchase the stock of others or assets of the corporation at public or private sale.

2. SAME—MAJORITY CONTROL.
   In corporations organized for business purposes and for the private gain of their members, the principle of the rule of the majority obtains to the extent that if the majority conclude that the business cannot be carried on with profit or advantage to all, they may, against the will of the minority, elect to wind it up.

3. SAME—FRAUD—ACCOUNTING—PLEADING—AMENDMENT—EQUITY.
On a bill by a stockholder in an elevator corporation for the value of his stock, alleging fraud by other stockholders in the sale of its property and assets for the purpose of paying its debts, pursuant to a vote by a majority of the stockholders, defendants were not equitably entitled to an amendment of the bill allowing the corporation to be made a party plaintiff, and then allowing one of the defendants to amend his answer by adding a cross-bill for the purpose of quieting his title to said property, which neither the corporation nor plaintiff had questioned, and the decree of the court below dismissing plaintiff's bill and quieting defendant's title will be modified on appeal and limited to dismissal of the bill, plaintiff having failed to establish his right to recover under the allegations in his bill.

Appeal from Bay; Davis, J., presiding. Submitted June 5, 1918. (Docket No. 30.) Decided December 27, 1918.

Bill by Charles Marcoux against William Reardon and others for an accounting for the conversion of certain shares of corporate stock. From a decree for defendants, plaintiff appeals. Modified, and affirmed.

*Kinnane, Black & Leibrand,* for plaintiff.

*W. E. Reardon,* for defendant Reardon.

*Gilbert W. Hand,* for other defendants.

STEERE, J. Plaintiff and defendants were stockholders in a corporation known as the Farmers' Elevator Company, of Pinconning, Michigan, organized and incorporated under the laws of this State in July, 1911, with an authorized capitalization of $12,000. It was in its inception a local promotion by certain citizens of Pinconning and vicinity, optimistically inaugurated with a view to building a large elevator at Pinconning as headquarters and acquiring control of the business in that vicinity and adjacent points,

where it was proposed to establish small elevators, or buying stations called "scoopers." Its first activity was the exhaustion of its capital in construction of an elevator, at Pinconning village, which commenced doing business in October, 1911. A report of the condition for the year ending December 31, 1911, showed $12,000 capital stock subscribed and paid in, $11,000 cash and $1,000 property, and indebtedness $8,000. Of its assets to balance this, $14,198.76 consisted of "real estate including full equipment of elevator to date." In 1913 the capital stock was increased, and proceeds from sale of stock devoted to enlarging and improving the plant by an addition to the bean department more than doubling its capacity.

There was an elevator at Pinconning in active operation when this company was organized, which had capacity to handle the naturally tributary business of the village and proved an active competitor. The project to develop feeders for the company's elevator by organizing buying stations and building small elevators at surrounding towns and stations to control the larger territory did not materialize. With all its capital invested in a plant, the company borrowed money from the beginning with which to run its business. It obtained loans from banks in Pinconning, Saginaw and Detroit, secured by indorsements of defendants and plaintiff. Whether it at any time during its career was run at a profit is a matter in dispute. In the fall of 1915, its outstanding stock amounted to $25,300, its plant had cost over $25,000 and its indebtedness amounted to approximately $16,-000, about $15,000 being bank paper upon which payment was urged. That the company was involved in debt and its financial condition a subject of solicitous discussion, particularly with defendants and plaintiff who were the principal stockholders and indorsers of its paper, is undisputed.

A stockholders' meeting was called on request of the requisite number of stockholders, including plaintiff, to meet on November 2, 1915. The purpose of such meeting, as stated in the notice to stockholders, being as follows:

—"taking action to relieve certain of the stockholders of said corporation from their personal liability of said corporation. It is the opinion of the officers and directors of said corporation that the only way in which the debts of the corporation can be paid will be by the sale of the property. You are hereby notified that this meeting is called for the purpose of taking such corporate action as may be necessary to dispose of and sell the property of said corporation, in order to pay its debts."

A meeting was held pursuant to notice, on November 2, 1915, at which 15 stockholders were present representing $22,060 of the capital stock. The record of that meeting shows that after it was called to order by the president and the notice stating its purpose read, free discussion was invited and several projects to relieve the situation were proposed and discussed. Amongst other things the record contains the following:

"Mr. Reardon and Mr. Naumes also stated that the persons individually liable for the debts of the corporation held more than 80% of the stock and that they were willing to enter into any arrangement to continue the business of said corporation whereby they would be relieved from their personal liability for the debts. Mr. Reardon, Mr. John Klumpp, Mr. Fred. Klumpp and Mr. Naumes and Mr. Charles Marcoux, each offered to surrender their stock without cost if they could be relieved from their liability on the notes."

Plaintiff does not deny the correctness of this record as to his making such offer, which is sustained by other witnesses, but says:

"I might have said it myself for all I know, but it

was simply a general discussion among the large body of men."

During that discussion Mr. G. C. Leibrand, who represented 50 shares of stock, after suggesting a receiver, further suggested the propriety of auditing the books of the company to determine how the losses had arisen, but on a motion that he be made chairman of a committee for that purpose declined to act on such committee and that subject was not pursued further.

After full discussion the following resolution was finally adopted:

"Whereas, the said Farmers' Elevator Company, a corporation, is largely in debt, with no money with which to pay the same, therefore be it—

"Resolved, that the property of said corporation, including all real and personal property of whatsoever nature, be conveyed to William Reardon, as trustee, to sell and dispose of same to pay the debts of said corporation, said debts amounting to $14,775.00, hereby authorizing said trustee to dispose of and sell said property for a sum to pay said debts or any amount in excess of same. Be it further—

"Resolved, that the officers of said corporation are hereby authorized and empowered to make, execute and deliver to said William Reardon, as trustee, proper conveyances to carry out the purpose of this resolution."

Of the 15 stockholders voting the recorded vote of members and shares shows, voting "yes": George Barie 60, Charles Bock 10, William' Fleis 5, Gilbert W. Hand 1, F. W. Klumpp 400, J. C. Klumpp 270, V. B. Klumpp 155, E. H. Klumpp 120, Charles Marcoux 451, E. C. Marcoux 68, Martin Naumes 81, William Reardon 515, making 2,136 shares, of $21,360 par value; while G. C. Leibrand voted 50 shares and two other stockholders 10 shares each, total number of shares 70, par value $700, against the resolution.

On the same day, November 2, 1915, the following agreement was signed by the parties to this suit:

"PINCONNING, MICH., November 2, 1915.

"We, the undersigned, for and in consideration of the mutual promise to pay the sum of $500 by each of the undersigned, for the purpose of forming the initial capital for the organization of a new corporation to take over the assets of the Farmers' Elevator Company and pay the debts of the Farmers' Elevator Company, do hereby severally subscribe and agree to pay the sum of $500 to William Reardon, as trustee for the purposes above set forth, on or before .... days from the date hereof, all on condition and with the promise that said Farmers' Elevator Company take proper and necessary corporate action, conveying the assets of said Farmers' Elevator Company to said William Reardon, trustee.

> "MARTIN NAUMES,
> "WILLIAM REARDON,
> "JOHN G. KLUMPP,
> "CHARLES MARCOUX,
> "FRED. H. KLUMPP,
> "EDWARD H. KLUMPP,
> "GEORGE BARIE,
> "VAL B. KLUMPP."

The property was conveyed to Reardon as trustee pursuant to the resolution adopted at the stockholders' meeting and efforts were made by him to sell the same to various outside parties interested in the elevator business without success and he then tried to sell it by auction. Notice of a public sale to the highest bidder was advertised in the Bay City Times-Press, which had a circulation of from eight to ten thousand copies, and the property was offered at public sale at the time and place noticed, but no buyers appeared, nor were bids made except by Mr. Hand, the attorney for the company since its organization, who there stated he was bidding the property in for the eight men who signed the $500 agreement of November 2, 1915. It was struck off to him for the amount of the indebtedness, but he paid no money upon his bid and nothing was done to relieve the situation. Reardon

was unable to get any co-operation for financing the project under the agreement by the indorsers of November 2, 1915, or find a purchaser for the property who would pay more for it than the indebtedness, as he testified, and he finally negotiated a sale to Fred. W. Klumpp for $15,845.44, the full amount of the company's indebtedness, and the following paper was signed by defendants:

"November 26, 1915.

"In consideration of the assumption and payment of the debts in full of the above company, whereby the undersigned are relieved from all liabilities on the indorsements and obligations of said company, and fully understanding that Fred. W. Klumpp is the party who has advanced the necessary money to pay the said debts, and relieved the undersigned from liability as aforesaid, particularly hereby referring to those persons who are liable on said indorsements, we hereby waive any and all rights growing out of the foregoing writing, as the result of which William Reardon, trustee, on November 16, 1915, conveyed all the property of said company to Gilbert W. Hand, attorney for said above named parties, hereby authorizing William Reardon, as trustee, to execute and deliver the necessary instruments to convey said property to Fred. W. Klumpp, or any person that he may name, all subject to the agreements and obligations, whereby said Fred. W. Klumpp advances the necessary money to pay the debts of said company.

"In witness whereof the said parties before above named have hereunto subscribed their names for the purposes and intents herein set forth.

"MARTIN NAUMES,
"WILLIAM REARDON,
"FRED. W. KLUMP,
"VAL B. KLUMPP,
"GEORGE BARIE,
"JOHN G. KLUMPP,
"EDWARD H. KLUMPP."

Plaintiff refused to join with defendants in the execution of this instrument at a meeting to which he

was invited for that purpose, leaving to seek other counsel after some heated discussion and after an undiplomatic demonstration against him by the attorney for the company because of his declining to co-operate.

Acting as trustee under the resolution adopted at the stockholders' meeting of November 2, 1915, and the consent of all indorsers of the company's paper except plaintiff, Reardon transferred the property to Val B. Klumpp by direction of his father Fred. W. Klumpp, who paid to Reardon $15,845.44 in cash for the same. The money was thereupon put in the Pinconning bank to the latter's credit and he drew checks to that amount with which he paid all indebtedness of the Farmers' Elevator Company in full, receiving no compensation for his services as trustee in the proceeding.

Fred. Klumpp testified that he then offered plaintiff an interest in the property "half or more if he wanted it," and told Mr. Hand to write him. Hand wrote plaintiff, on November 27, 1915, reviewing the situation and claimed conditions which necessitated and justified the sale, stating that Fred. Klumpp was perfectly willing to have plaintiff go in with him if he desired to, and he could take on the same basis of cost a half, or a quarter, or an eighth interest in the investment. Of this plaintiff said:

"I would not go in that way. I wanted a controlling interest or none at all after the kind of a deal they were giving me."

When the resolution of November 2, 1915, was adopted authorizing Reardon to sell the property as trustee plaintiff owned 451 shares of stock in the company and his son Ezra 68, which they voted in favor of said resolution. He filed this bill of complaint, on July 22, 1916. In it he states that he has acquired by assignment his son's stock, 100 shares previously

belonging to Rev. Entrope Langlais and 50 shares
from G. C. Leibrand, who appears as one of his at-
torneys in the suit, "with all the rights and equities
arising out of the ownership of such stock and the
conversion thereof," doing so "to avoid multiplicity
of suits and to determine and dispose of the rights
of said Langlais and Leibrand, together with your
orator, in one action"; thereby representing 669 of
the 2,530 shares of stock issued by said company.

The substance of his grievances as set out in his
bill with detail of facts as he claims them is that he
was misled and deceived by "misrepresentations which
were made to him by defendants, and from statutory
reports of the financial condition of the company and
the reports made at meetings of the stockholders and
directors of the condition of the company" and was
by them "induced from time to time to subscribe for
more of the company's stock in order that money
might be procured for the purpose of enlarging and
improving the elevator company's plant and adding
new machinery"; that he relied upon such representa-
tions and believed the financial condition of the com-
pany was good until shortly before November 2, 1915,
when he received notice from the secretary of a meet-
ing to be held on that date "for the purpose of selling
the elevator and all of its property to pay its indebted-
ness," and was about that time informed by defend-
ants that the company was in bad straits financially
and heavily indebted, for which reason it was neces-
sary in order to continue the business "to form a new
company which would take over the assets of the old
company and which would make it necessary for the
stockholders to put into the business about $500 each
of ready cash to put the business again upon its feet";
and believing the representations made by defendants
as to the bad financial condition of the company he
signed the agreement of November 2d relative to a

new organization; that by various false representations and claims of emergency by defendants at the stockholders' meeting of that date the resolution authorizing a trustee sale prevailed; that he fully relied upon the promises of defendants that the proposed reorganization of the company would be carried out and offered to pay over the $500 "being his share of the proposed reorganization," and after waiting some time endeavored to find out the cause of delay, but defendants represented they knew nothing about the matter, until on November 26, 1915, he was called to Pinconning "to attend to matters in connection with the elevator company's business;" which he supposed was to carry out the reorganization, when he first learned it had been abandoned and he was requested to sign the paper of that date authorizing sale of the plant to Fred. Klumpp for sufficient to pay the company's debts, which he protested against and refused to ratify,—

"but nevertheless said defendants conveyed and caused said property to be conveyed to Val B. Klumpp mentioned in the paper aforesaid, thereby finally absorbing and disposing of all of the assets of said corporation, and that they thereby converted the stock of your orator and that recently assigned to him by Father Langlais and G. C. Leibrand, and have appropriated the same to their own use. That said defendants are now in control of said elevator and property and are operating the same and that they have placed the title thereon in the name of Val B. Klumpp in trust for said defendants."

He further alleges that the property of the company was worth much more than represented by defendants, or the amount of indebtedness for which it was sold; that defendants fraudulently conspired together to and, by the course pursued, did in effect and fact deprive him and those he represents of their stock; and thus converted the same to their own use. The relief asked is for an accounting, an injunction and a de-

cree against defendants for the value of the stock so converted by them with a first lien for the amount decreed on the "property and real estate" of the company as described in the bill.

Defendants by their answers make denial of all wrong-doing charged, traverse the various allegations of plaintiff's bill in detail with their versions of transactions mentioned, allege that plaintiff was actively connected with the company as a director throughout its career, was conversant with and as a director participated in its general management and the things of which he now complains, except the final sale, was familiar with its financial embarrassment and with defendants became an indorser liable for its indebtedness, had offered his stock to any one who would relieve him of liability, as did defendants, and voted for the resolution authorizing a trustee's sale for sufficient to pay the indebtedness and release them; that none of the defendants have any interest whatever in the property sold, or former assets of the company, except Fred. Klumpp and his son, to whom it was sold and transferred by the trustee for the best procurable price, with which the indebtedness was liquidated; and denying any fraud, deceit, concealment or conversion, defendants ask dismissal of plaintiff's bill.

The case was heard upon testimony taken in open court, which went very fully into the history of this unfortunate business venture from the viewpoint and facts claimed by the respective sides. An advisory jury on the proposed issues of fact was at first called, but after listening to the evidence the court dispensed with its services and dismissed plaintiff's bill, saying in part:

"There was a resolution passed by a majority of the stockholders in number and amount and the plaintiff in this case was present at that meeting in which that resolution was passed, took part in it, entered

into the discussions, signed the agreement between the parties. If there was anything at all that was illegal in this matter or oppressive to the minority stockholders it was the feature of it that provided for the disposal of that property and re-organizing and putting it into the hands of the parties by the payment of $500. It was later sold without that requirement being carried out and entered into. There was no action taken by the plaintiff till he had been relieved of his liability as guarantor and indorser on paper of that company to the extent of several thousand dollars. The entire condition had changed, and it appears to the court that he is not in a position to come into this court at this time and complain; that he ought to be estopped from coming in. There was a time to provide for the best interests of all the stockholders, himself included, when the property was not being sold, on application to this court or it could have been disposed of any time as pointed out by the statute. He failed to do that. At that time the rights of all the parties could have been taken care of, and these several parties that rely on it, for these large amounts of paper of the company as indorsers and guarantors of the several banks. He had an opportunity not only to protect himself but the rights of the stockholders and he failed to take that step until he had been released and relieved of that large liability that stood against him, neither does it appear in this case by any proof that that property ought to or could have brought more under any circumstances or conditions that existed, and that being true it does not appear that even the assignors with their small claims put into the hands of Mr. Marcoux have met with loss and damage, and that being true I think in this case that the bill ought to be dismissed." * * *

Appellant's counsel say in their brief that the three controlling points in the case which the court erroneously decided adversely to their contention are as follows:

"1. Did plaintiff's stock have a substantial value?

"2. Was there a conversion of the stock?

"3. Is plaintiff estopped from maintaining this suit?"

The principal stockholders and promoters of this elevator company were also stockholders of the Citizens State Bank of Pinconning, of which plaintiff and certain of defendants were directors, Naumes being cashier and Val B. Klumpp assistant cashier. That the elevator then in Pinconning did its banking business with a rival bank is ascribed as one of the motives in this promotion. Plaintiff was a prosperous farmer of recognized responsibility in that community and became a subscriber for stock in the new elevator project at the proposal, as he states, of defendants Naumes, Barie and others, first subscribing for $1,-000. He participated in the organization and was a director from the beginning. The directors of the Citizens State Bank and Farmers' Elevator Company were largely the same. Defendant Reardon, who was an experienced elevator man living at Midland and in a business of his own, was employed as manager under a written contract of August 1, 1911, at $1,000 a year. He at first subscribed for 100 shares of stock and took charge of erecting the plant. He became a director 19 months later and took more stock when emergencies for money arose until he held and had paid for $5,000 in stock when the property was sold. One thousand dollars salary was paid him for two years and two months, then reduced by his consent to $500 per year, which was paid him for three months, until April, 1914, after which he received no compensation for his services. He testified, and it is nowhere directly disputed, that when the organizers of the company engaged him it was understood he was not to look after the financing, but to furnish his knowledge and experience in constructing the plant, selling the product, directing the buying, etc., through hired help in direct charge; that he told them on the start it would take a good deal of money to carry out their project, and plaintiff spoke up and said, "we have got

the money. We intend to put in buying stations all around," and in the meeting when they organized "Mr. Naumes, Mr. Marcoux and Mr. Barie seemed to be the most enthusiastic men"; that he built just what they asked for, though too large for the local business, with a view to reach the open territory which could be made tributary; but they did not put up the money to establish stations at other points and the territory was taken up by competitors. None of the stockholders, except the indorsers and board of directors, increased their original subscription, the plant was not making any money, they were not reducing their liabilities, it was voted at a stockholders' meeting in August, 1915, to mortgage the plant for $15,000, which Naumes was to look after, but nothing came of it; he had secured a loan of $10,000 from a Saginaw bank for the company on the indorsement of himself and the other directors, which they had carried for a couple of years and was then being pressed; the company had no money to do business with, its credit was impaired, he and the other indorsers were unwilling to assume further liability and the action authorizing him to sell the property to pay debts was taken as related; that when Hand bid in the property at the public sale for the debts Naumes said he would look after the matter and the money would be forthcoming, but no money was paid in and he thereafter sold the property for enough to pay the debts, as he had been authorized to do, which was the best price he could obtain, and losing as a result of the sale $5,150 which he had paid for his stock, and, after completing his trust by paying all the company debts with the proceeds of the sale, had no interest in the property sold or its further disposition or use.

It is undisputed that this pretentious project to center the elevator business in Pinconning was unsuccessful and all stockholders lost the money they paid

for stock in the concern, including plaintiff and defendants, unless the latter by some secret combination and agreement fraudulently absorbed and acquired "all of the assets of said corporation" and thereby converted the stock of plaintiff, and all other stockholders not in the conspiracy, to their own use, and in the name of a dummy, or secret trustee, now control and operate the property of the elevator company for their own benefit as plaintiff alleges, and as to which the burden of proof rests upon him. His only claimed circumstantial proof to establish this is that the property was sold to one of defendants for less than it was worth, and not to all the eight parties to this suit, including himself, as was contemplated under the agreement of November 2, 1915.

The logic of his grievance as to the agreement of November 2d being abandoned would seem to be that it was a conversion to sell the property, for the amount of the company's debts, to the seven stockholders or to one of them for the use and benefit of himself and six others, but it would not be a conversion if all the eight stockholders who signed the agreement had bought it for the amount of the debts. He testified that he would not have voted at the stockholders' meeting as he did, authorizing Reardon as trustee to sell the property for the amount of the debts, "if it had not been for that previous agreement" and says that, after the property was bid in by Hand,—

"I went into the bank at Pinconning and asked Mr. Naumes what the reason was that the transaction didn't go through. He had lots of reasons, didn't have the money was one, and told me to see Fred. Klumpp, so I went to Fred. Klumpp's store and stated that to him. Mr. Klumpp and I went to the bank. We went into the back room, he and I and Mr. Naumes. Mr. Klumpp seemed to be very anxious to put the matter through and so was I";

It is undisputed that after Fred. Klumpp bought and paid for the property, so that defendant was released from all liability as an indorser, Klumpp offered him not only an eighth, which would be his interest had they "put the matter through," but a quarter or a half on the same basis of cost, which it is inferable he was financially able to take if he so desired, as he states: "I told Mr. Hand that I wouldn't go into that deal any more unless I would get the controlling stock in that elevator." It is also argued in plaintiff's brief that "the $500 agreement, Exhibit U, does not provide that the subscribers shall be favored over the other stockholders," but upon the trial his counsel said:

"We want the record to show that the $500 agreement was entered into by these parties for the purpose of restricting any open competition at the sale."

The claim and testimony of defendants as to this agreement is that the parties to it were all liable for a large amount as indorsers and it was signed with a view of protecting themselves by taking the plant for its debts provided they could not find a buyer who would pay the amount of the debts of the company for its property and relieve them of it. But, whatever was intended, it was a crude and imperfect instrument purporting to obligate the signers to pay $500 on or before an unstated time, for a purpose no one is designated or obligated to carry out, including payment of the company's debts amounting to nearly four times the total sum they were to pay Reardon as trustee. Failure of the signers to act under it, of which plaintiff complains, is not evidence either of fraud or conversion of the company's stock by defendants.

The record does not bear out plaintiff's claim that he was misled and deceived by defendants as to the

financial condition and business of the company. He was a director of the company, a regular attendant at their meetings, and an active participant in its affairs from the beginning. His son was employed by the company at his suggestion, first as its bookkeeper and later in local charge of the plant. He had access as a director to its books and records and special opportunity to keep in touch with its affairs, which as a director it was his right and duty to do. As a director in the bank where its banking was done he had further opportunity. In "a general discussion among the large body of men," who were stockholders, meeting to discuss the financial affairs of the company, he offered his stock without cost to any one who would relieve him from his indorsements for this company of which he was a director, and voted for a sale of the property at a price sufficient to produce that result.

Plaintiff strenuously argues that the trial court erroneously found it was not shown that the "property ought to or could have brought more under any circumstances or conditions that existed." Upon the question of value the conditions that existed were the important consideration. That the property was openly offered at public and private sale and no one was found who would pay more than it was sold for is undisputed. The testimony is at variance as to the value of the property at the time and place it was sold. That it was a large and good elevator, well adapted to the purpose for which it was built, and capable of handling a large business, if the business was available and the company financed to handle it, is conceded, but the testimony is convincing of the deterrent condition that both were wanting. The situation is well stated in the report of an insurance adjuster named Wardwell, introduced by plaintiff to show the cost and value of the property, made after examining the plant to determine a basis for fixing insurance.

Plaintiff's counsel state that the "great value of his report lies in the fact of its total impartiality." He estimates the cost of the building at $13,000, machinery and plumbing at $10,000, and other equipment at $1,200, from which he deducts five per cent. for depreciation, making the then (1914) cost value $24,-000, but in discussing surrounding conditions and the affairs of the company he states: "The investment here is double what the business warrants, and good money has been thrown after bad," which is in substance the reason given by other experienced elevator men called by defendants for their opinions, that the property was sold for all, or more, than it was worth. We do not disagree with the conclusion of the trial court that plaintiff has failed to establish the contrary by a preponderance of evidence.

It is fairly shown that this corporation had proved unprofitable, was in a failing condition, had no money to pay its maturing debts and was without credit to renew the same or obtain means to conduct its business, unless defendants or other acceptable stockholders became personally responsible. Previous indorsers for its indebtedness to a large amount, who were not only its directors but most interested in its successful continuance if possible, refused to assume further liability, and at different times offered their stock gratis to be relieved of liability; doing so at the meeting of stockholders called to consider the financial condition of the company with no one indicating any inclination to accept the offer. That meeting authorized, by a large majority of members and amount of stock, what is now complained of.

It is true that our statute authorizes a method for winding up the affairs of a corporation when in failing condition by appointment of a receiver and it is argued that the course pursued here was irregular and unauthorized. While the statutory method would

be more regular and apparently the wiser course in case of an objecting stockholder, the statute does not make unlawful other methods taken by authority of the majority where all have equal opportunities to purchase the stock of others, or assets of the corporation at public or private sale; neither does plaintiff ask that the course taken here be annulled and a receiver appointed. His counsel say in their brief:

"It is not sought by this suit to recover the property or to set aside the sale, but merely to recover the value of the stock."

"The right of the majority stockholders of a corporation established for manufacturing or trading purposes to wind up its affairs, and dispose of its assets, even against the objections of the minority stockholders, whenever it appears that the business can be no longer advantageously carried on, is well recognized. *Treadwell* v. *Manufacturing Co.*, 7 Gray (Mass.), 393; *Wilson* v. *Proprietors*, 9 R. I. 590; *Lauman* v. *Railroad Co.*, 30 Pa. St. 42." *Hayden* v. *Directory Co.*, 42 Fed. 875.

The general rule is stated as follows in 10 Cyc. p. 1302:

"In corporations organized for business purposes and for the private gain of their members, the principle of the rule of the majority obtains to the extent that if the majority conclude that the business cannot be carried on with profit or advantage to all, they may, against the will of the minority, elect to wind it up. So if, in the exercise of a sound discretion, a majority of the stockholders deem it expedient to do so, they may sell out the whole property of the corporation."

To discontinue a failing business and proceed to sell the property and pay the debts is not a breach of trust. *Rothwell* v. *Robinson*, 44 Minn. 538 (47 N. W. 255).

"If, however, the corporation is an unprofitable and failing enterprise, then a sale of all corporate property with a view to dissolution may be made." 2 Cook on Corporations (6th Ed.), § 670.

Amongst the numerous cases cited to sustain this general proposition appears *Doyle* v. *Leitelt*, 97 Mich. 298.

The case of *Thoman* v. *Mills*, 159 Mich. 402, is somewhat analogous to this in the particular that defendants also took what the trial court termed a "short cut to the inevitable result" and did not approve that course, but, finding that the sale was made in good faith and the result would have been the same if legal formalities had been observed, awarded only nominal damages. In the controlling opinion approving the result and affirming the decree this court said:

"It is not believed a case can be found where relief was granted to a stockholder in a prior corporation which was sold to a later corporation under the circumstances disclosed by this record."

That case, however, differs from this in various material particulars. There the assets of a prior corporation were sold to a later corporation in which defendants were interested; complainants did not vote in favor of the sale at the stockholders' meeting authorizing it, nor was the property offered at public sale, or equal opportunity given to them and other stockholders to purchase.

At conclusion of the hearing, after intimation from the court that the bill should be dismissed, defendants' counsel moved the court that the corporation be made a party plaintiff, and defendant Val B. Klumpp have permission to file an amended answer asking for confirmation of his title to the property, which was objected to by counsel for the plaintiff, and the court intimated that course would be permitted, an order of that kind would be made and a decree to that effect granted. We find no record of any order making the corporation a party to the suit, bill of complaint by it or amended answer as proposed, but the decree dis-

missing plaintiff's bill also contains a provision quieting the title of defendant Val B. Klumpp to the real and personal property conveyed to him by Reardon as trustee with costs to defendants. In behalf of plaintiff the latter portion of the decree is strenuously objected to as not warranted by any pleading or issue in the case, and it is insisted that at least nominal damages should be awarded to him with costs, or if the bill is dismissed it should be without costs in view of the course pursued by defendants.

It is charged as one of the grievances in plaintiff's bill that for the purpose of completing the conversion of his stock in the corporation defendants filed with the secretary of State, on December 18, 1915, a notice of dissolution of said corporation effected by sale of all its property, corporate rights and franchises. Defendants admit this in their answer, but deny that it was done for the purpose of converting plaintiff's stock, alleging that it was in the interest of plaintiff and all other stockholders. While defendants could not technically dissolve the corporation by such proceeding, neither they nor the corporation as such are in an equitable position to insist upon its being made an active participant as plaintiff in this suit, and then in behalf of one of defendants ask to amend his answer by adding a cross-bill for the purpose of quieting his title under a conveyance it gave through a trustee which neither the corporation nor plaintiff has questioned, the theory and purpose of this suit being to recover from defendants the value of plaintiff's converted stock, not to set aside or attack the sale as such nor recover the property sold.

We agree with the conclusion of the trial court that plaintiff has failed to establish his right to recover under the allegations in his bill, which should be dismissed, but find nothing under the circumstances dis-

closed in this case to move the conscience of a court of equity upon either side.

The decree of the lower court should be limited to dismissing plaintiff's bill, and so modified will stand affirmed without costs to either party.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.